**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| ) | | |

ANTHONY PAGLIARONI, VICKI O'BRIEN, )
JOHN COSTELLO and CATHERINE LYNCH )
on behalf of themselves and others similarly )
situated, )
               )
        **Plaintiffs,** )
               )
        **v.** )         **Civil Action No. 12-10164-DJC**
               )
               )
**MASTIC HOME EXTERIORS, INC.** and )
**DECEUNINCK NORTH AMERICA, LLC,** )
               )
        **Defendants.** )
               )
               )
_____)

**MEMORANDUM AND ORDER**

CASPER, J.                                                          September 21, 2015

**I.      Introduction**

      This is a putative class action arising out of alleged defects in Oasis Decking ("Oasis"), a

wood-plastic composite exterior decking product.   Proposed class representatives Anthony

Pagliaroni ("Pagliaroni"), Vicki O'Brien ("O'Brien"), Catherine Lynch ("Lynch") and John

Costello ("Costello") (collectively, "Plaintiffs") seek damages and injunctive relief from

Defendants Mastic Home Exteriors ("Mastic") and Deceuninck North America ("DNA") arising

1

from damage to their decks allegedly caused by a defect in the Oasis formula.  Plaintiffs assert claims for breach of warranty, negligence, misrepresentation and unjust enrichment, as well as state law claims.  D. 53.  Plaintiffs have moved for certification of a class encompassing all owners of homes or buildings in Massachusetts, Minnesota, New York and Oregon where Oasis is or has been installed, with limited exceptions.  D. 94 at 1.  For the reasons set forth below, the motion for class certification is **DENIED**.

## II.     Factual and Procedural Background

### A.     <u>Oasis Composition</u>

DNA designed and manufactured Oasis from 2004 to 2008 and Mastic was the exclusive distributor.  D. 53 ¶ 2; D. 159-1 at 2; D. 159-2 at 2.  Oasis is a manufactured composite decking material made of wood flour, high-density polyethylene ("HDPE") and micro ingredients such as talc.  From 2004 to 2008, DNA manufactured enough Oasis to produce approximately 20,000 average size decks.  D. 124-7 at 5-6.

DNA licensed a patented composite formula and manufacturing process from Strandex.  D. 159-4 at 3-4.  Pursuant to this process, a heated composite mixture was pushed through a stranding die before products were molded into final form.  <u>Id.</u> at 8.  Plaintiffs allege that Strandex recommended use of a particular brand of HDPE called Solvay but DNA instead used A-Top, another brand of HDPE.  <u>Id.</u> at 10, 12.  The HDPE formula used by DNA contained a higher percentage of talc than recommended by Strandex.  D. 159-8 at 2.  Strandex objected to DNA's use of a high-talc formula and A-Top HDPE.  D. 159-14.

Drs. Joel Wolf and Manual Garcia-Leiner submitted a report (the "Exponent Report") on the cause of Oasis's failure.  D. 159-13.  They noted that the high-talc formula and use of ATOP

(instead of the recommended Solvay) HDPE "would limit the encapsulation of the wood flour in Oasis products, potentially affecting the performance of the boards, including increased water absorption." Id. at 9.  They concluded that Oasis "suffers from the common defect of excessive water absorption" that results in swelling, cupping and cracking of the product. Id. at 10.

Defendants have proffered expert testimony that challenges the methodology and conclusions of the Exponent Report.  Mastic submitted an expert report in which Dr. Karl Englund opined that the Exponent Report was unreliable because it relied significantly on a biased sample—the decks for which warranty claims had been submitted—that did not take into account the performance of all Oasis decks. D. 131-7 at 2-3.  Dr. Englund also concluded that the authors of the Exponent Report did not take necessary steps to rule out manufacturing defects that could have rendered some but not all Oasis decks defective.  Id.  DNA proffered expert testimony from Dr. Anatole Klyosov, who not only critiqued the Exponent Report, but also concluded that the performance issues observed in some Oasis decks are not the result of a common defect of excessive water absorption related to Oasis's formulation but rather of variables in the manufacturing process.  D. 131-6 at 6-7.

Plaintiffs allege that DNA misrepresented the composition of Oasis during its certification process.  DNA was required to demonstrate that Oasis complied with building codes before it could market Oasis.  D. 96-1 at 39, 43-44.  As part of this certification process, DNA retained Washington State University to perform tests on Oasis.  Id. at 44-46.  The results were sent to the International Code Counsel Evaluation Services (ICC-ES), which reviewed the data for compliance with building codes.  Id. at 44, 48-50.  Plaintiffs allege that DNA submitted Oasis boards made with the Strandex formula instead of boards that used the high-talc formula and A-

Top HDPE for certification purposes.    D. 99 at 14.    Under ICC-ES rules, Defendants were obligated to report material changes in the formula for Oasis to ICC-ES.  D. 159-15 at 3; D. 159-16 at 3-4.  In a declaration to ICC-ES on January 17, 2007, a DNA employee represented there had been no such changes.  D. 159-17 at 2.

Starting in July 2005, several weathering tests conducted by Mastic on Oasis showed cracking.  See D. 159-20.  Plaintiffs allege that DNA and Mastic knew of Oasis cracking and splitting by July 2006.  D. 159-21 at 3.  By early September 2006, DNA and Mastic were considering three possible cures for the cracking and splitting they observed:  eliminating stranding, changing formulation or changing the physical design.  D. 159-22 at 2.

### B.    Oasis Distribution and Marketing

Mastic did not sell Oasis directly to homeowners.  Instead, it employed a network of distributors.  D. 126 ¶ 3.  Mastic sold Oasis to distributors or other intermediaries, who resold Oasis down a multi-tiered distribution chain until an end user bought the product.  Id. ¶¶ 3-9. Due to its indirect distribution system, the only records Mastic has of homeowners that own or owned Oasis decking are its warranty claim records.  Id. ¶¶ 11-13.  Of the approximately 20,000 people who purchased Oasis decking, approximately 2,000 submitted warranty claims.  Id.; D. 125 ¶ 5.  Accordingly, Mastic has records of only approximately 10% of homeowners who purchased Oasis.

Mastic made various representations in Oasis manuals and brochures as to the durability of Oasis, including:

- Oasis is a "low-maintenance product," D. 96-1 at 80, 86;

- Oasis should be cleaned with a hose or brush because Oasis is a "low-maintenance product, not a no-maintenance product," id. at 73;

- Oasis manufacturing process "ensures a flat, even surface that won't cup or warp," id. at 75, 92;

- Oasis "will never rot, splinter, split, cup, or check," id. at 76, 93;

- Oasis "resist[s] rot, splinters, cupping and checking for barefoot enjoyment year after year," id. at 82, 88; and

- Oasis is "engineered to outlast and outperform ordinary wood and composite decks for years of enjoyment," id.

Mastic marketed Oasis using a variety of written marketing materials, including print advertisements, brochures, website materials, tear sheets, physical samples and point of purchase displays that varied from material to material and year to year.  D. 126 ¶¶ 15-16.  For example, one line of print advertisements for Oasis had three variations:  one directed at contractors, one at architects and one at homeowners.  Id. ¶ 17; D. 126-1–126-3.  Because the three variations had different target audiences, they contained different emphases: the advertisement directed at architects emphasized the manufacturing process, the one directed to contractors emphasized its workability and ease of installation and the one directed to homeowners made no mention of the manufacturing or installation process at all, instead emphasizing the look and feel of the product. D. 126 ¶ 17.

Mastic notes that the Oasis advertising materials directed at consumers covered additional topics beyond durability.  A multi-page brochure that Mastic used, for example, discussed the "hidden fastener system" (an installation option) and contained a discussion of "what to expect" from Oasis decking.  D. 126 ¶ 18; D. 126-4.  An earlier version of the multi-page brochure contained no discussion of hidden fasteners, instead emphasizing the "beauty" of the product, the fact that the product did not require painting or staining and the fact that it did not get too hot when exposed to the sun. D. 126 ¶ 19; D. 126-5.  Other versions of this brochure

discussed Oasis's "breakthrough styling" and "realistic embossing," the ease of installation or price deals for winter purchases.  D. 126 ¶ 20; D. 126-6–D. 126-8.

Mastic's sales representatives also made oral representations to the distributors and the contractors who purchased Oasis from distributors.  D. 126 ¶ 22.  Mastic employed approximately 50 sales people who called on hundreds of customer locations.  Id.  These sales pitches did not follow a script and the sales team was expected to use discretion to communicate about Oasis in a way that would be effective with a particular distributor or contractor.  Id.  The sales team emphasized such qualities as color, color hold, texture, price, maintenance, physical characteristics, or other attributes depending on the sales person and the distributor.  Id.

## C.   <u>Oasis Warranties</u>

Mastic initially offered a ten-year limited warranty.  D. 96-2 at 6-10.  The warranty promised that "if the products are defective, we will replace them" for a period of ten years.  Id. at 8.  The warranty stated that Oasis "products will not crack, split, splinter, or suffer structural damage due to termites, insects, or fungal decay."  Id.  The warranty promised that Mastic would, "[a]t [its] sole option . . . provide replacement product or refund . . . the value of the products found to be defective (labor not included)."  Id. at 9.  The warranty excluded damage done by various specific factors, such as improper installation.  Id.  The ten-year warranty was not transferrable.  Id.  Mastic changed this warranty in 2006, extending the period to twenty-five years and making the warranty transferrable to future homeowners.  D. 96-2 at 4.

When an owner submitted a warranty claim, Mastic gathered the relevant information about the owner's deck, including a third-party inspection by Crawford & Company ("Crawford") when necessary, and sent it to DNA for determination on the claim.  D. 125 ¶ 4.

DNA would then reimburse Mastic for warranty claims granted.  Id.  Mastic communicated the decision to the customer and sent a release for the customer to sign.  Id.  When Mastic received the customer's signed release, it sent a check or replacement product.  Id.

Through the end of 2013, DNA resolved 1792 warranty claims.  D. 125 ¶ 5. DNA approved and paid 1730 claims or 96.5% of these claims.  Id.  Almost half of the denied claims were denied on the basis that the claimant did not have Oasis decking, the claim was for an item not covered by the warranty (such as color fade) or the claim had already been paid.  Id.  In between one-half and three-quarters of the approved claims, DNA agreed as a matter of goodwill to pay some or all of the labor costs associated with replacing the deck, even though labor costs were not covered by the warranty.  Id. ¶ 6.  Of consumers who submitted Oasis warranty claims, 80% reported warping and 90% reported cracking.  D. 99 at 10; D. 159-13 at 10.

Plaintiffs submitted an expert report from Steven Wright of S.C. Wright Construction Inc. ("Wright Report") setting forth a formula to calculate damages as measured by the repair or replacement costs to homeowners.  D. 96-2 at 40-44.  This formula is based upon the size of the deck and its location, with additional considerations pertaining to the scope of damage and the surrounding landscape.  Id. at 42-43.  The Wright Report posits that an inspector could identify which deck components require replacement by placing a sticker on each damaged component and taking photographs of the entire deck.  Id. at 42.  Plaintiffs assert that this formula can be applied uniformly to estimate damages.

D.      **Putative Class Representatives**

*1.      Pagliaroni*

Pagliaroni had Oasis installed at his home in Massachusetts in 2006.  D. 96-2 at 48.

Pagliaroni and his wife relied on their contractor's recommendations, knowledge and

representations about what composite deck product to purchase. D. 124-4 at 4-8.  The contractor

provided a sample of Oasis and a brochure about the product.  The Pagliaronis liked the color

options and feel of the sample board.  Id. at 9-10. Their contractor made representations to them

about Oasis, specifically that the boards would not loosen, that there was no weatherproofing to

be done and that they only had to wash it with a hose.  Id. at 12-13.  One year later, the deck

showed signs of gapping and splitting.  D. 96-2 at 53.  The deck started cupping in 2008 and

decking boards started to split in 2009.  Id. at 53-54.   Pagliaroni submitted a warranty claim to

Mastic in April 2011.  Id. at 55.  Mastic offered a claim settlement of approximately $5,900.  Id.

at 56.  Pagliaroni rejected the offer because it would not cover all costs of replacing his deck,

including removal of old material, purchase of new material and labor to remove the old deck

and install the new one.  Id. at 57, 59.

*2.      O'Brien*

O'Brien had Oasis installed at her home in Minnesota in 2006.  D. 96-2 at 62.  Before

choosing Oasis, O'Brien and her husband reviewed two brochures for Oasis that were provided

to her by the lumberyard where her contractor ultimately purchased the product. D. 124-5 at 5,

7.  O'Brien also relied on representations from her husband about Oasis being a low maintenance

product, which were made to him by people at the lumberyard and retailer where he inquired

about the product.  Id. at 3; D. 124-6 at 3.  She chose Oasis because it required little maintenance

and was covered by a 25-year warranty.  D. 96-2 at 63-64.  In 2011, O'Brien's deck started to develop mold.  D. 96-2 at 68-70.  In 2012, her deck was cupping, cracking and splitting.  Id. at 72.  O'Brien contacted Mastic in June 2012 to request a warranty payment.  O'Brien's claim was denied because the inspector determined that her damage was caused by improper installation. Id. at 74.

### 3. Lynch

Lynch had Oasis installed at her home in New York in 2007.  D. 96-2 at 81.  She selected Oasis on the basis of its durability and 25-year warranty.  Id. at 86-88.  Lynch looked at samples of different decking, such as CertainTeed, Trex and AHE.  Id. at 82.  She also reviewed brochures and other marketing materials about the various products, including Oasis, and additional information online.  Id. at 84.  Her deck started to crack, mildew and discolor in 2009. Id. at 89-90.  In 2011, she observed cupping, warping and splitting and contacted Mastic to make a warranty claim. Id. at 91-95.  Mastic offered to settle her claim for approximately $9,500.  Id. at 96.  Lynch rejected this offer on the grounds that it would not cover all costs of replacing her deck. Id. at 101-02.

### 4. Costello

Costello had Oasis installed at his home in Oregon in 2008.  D. 96-2 at 100.  Costello briefly reviewed an Oasis brochure provided to him by his contractor but primarily relied on his contractor's representations that installing an Oasis deck would be the end of his maintenance problems.  D. 124-1 at 4.  Costello did not recall whether he viewed the actual warranty prior to purchasing Oasis and took no steps to determine the terms of the warranty.  Id. at 5-6. Ultimately, Costello's wife selected Oasis because of its texture and color.  She brought home a

sample with the texture and color she desired, without knowing the brand of the product or anything about its performance or warranty.  D. 124-2 at 3-4.  In 2011, Costello noticed that his deck was cracking.  D. 96-2 at 104-06.  In 2012, Mastic offered to settle his warranty claim for approximately $1,500, which Costello rejected.  Id. at 109-11.

###   E.   Procedural History

On January 27, 2012, Pagliaroni filed the instant putative class action.  D. 1.  In the Second Amended Complaint, filed on May 29, 2013, Plaintiffs[1] assert claims against Mastic for breach of express warranty and negligent misrepresentation and against both Defendants for breach of implied warranty, unjust enrichment and negligence.  D. 53 ¶¶ 137-218.  A Massachusetts sub-class asserts a claim against Mastic for violation of Massachusetts consumer protection laws.  Id. ¶¶ 219-25.  A Minnesota sub-class asserts a claim against Mastic for violation of Minnesota unlawful trade practices and false advertising laws.  Id. ¶¶ 226-40. Finally, a New York sub-class asserts a claim against Mastic for violation of New York consumer protection laws.  Id. ¶¶ 241-45.

The parties have also filed motions to exclude portions of expert witness testimony under the standard set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592–93 (1993).  D. 137; D. 160; D. 165; D. 175; D. 178; D. 189.  Briefing on the Daubert motions filed by Plaintiffs and Mastic was completed prior to the hearing on the class certification motion, while DNA's three Daubert motions were filed the day before the hearing.  The Court heard oral argument on the pending class certification motion and Plaintiffs' and Mastic's Daubert motions and took

---

[1] In addition to the four named Plaintiffs, plaintiff Melisa Burnett was also listed as a putative class representative in the Second Amended Complaint.  D. 53.  Burnett voluntarily dismissed her claims against Defendants with prejudice on June 12, 2013.  D. 54.

these matters under advisement.  D. 184.  Plaintiffs later filed a motion to strike DNA's <u>Daubert</u> motions as untimely and in violation of Local Rule 7.1(a)(2).  D. 189.

III.   **<u>Daubert</u> Motions**

   A.   **<u>Legal Standard</u>**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which requires that an expert's testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods," and that "the expert has reliably applied the principles and methods to the facts of the case."  Expert testimony must be reliable, such that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue."  <u>Daubert</u>, 509 U.S. at 592–93.  <u>Daubert</u> established a framework that "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Id.</u> at 597.  Relevant expert testimony must help the trier of fact "understand the evidence" or "determine a fact in issue."  Fed. R. Evid. 702.   The analysis must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  <u>Daubert</u>, 509 U.S. at 591 (quoting <u>United States v. Downing</u>, 753 F.2d 1224, 1242 (3d Cir. 1985)).

Courts have discretion to consider a variety of factors in assessing the reliability of an expert's methodology.  Among the non-exhaustive list of factors that may be relevant are (1) whether the method "can be (and has been tested)"; (2) whether it "has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) the "general acceptance" of the methods within the relevant scientific community.  <u>Id</u>. at 593-94.  <u>Daubert</u> places the burden on the "proponent of the evidence [to] show that the expert's conclusion has

been arrived at in a scientifically sound and methodologically reliable fashion." <u>Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 161 F.3d 77, 85 (1st Cir. 1998).

     **A.**     **Dr. Englund Expert Testimony**

Plaintiffs have moved to exclude the testimony of Mastic's expert, Dr. Englund.  D. 160. Dr. Englund was retained to assess the reports of Plaintiffs' experts to "see if the testing was done right, if the right tests were there, if the right conclusions were made based upon the test results."  D. 164 at 23, 26.  Plaintiffs argue that Dr. Englund's opinions are inadmissible because he did not review the same documents or data as did Drs. Wolf and Garcia-Leiner, nor did he conduct his own testing.  D. 161 at 1-2.  Plaintiffs also note that Dr. Englund relied heavily on the testimony of Mr. David Couchot, a former DNA engineer who often in his deposition was unable to provide specifics about the Oasis manufacturing process.  <u>Id.</u> at 4.  Plaintiffs argue that Dr. Englund's opinions are inadmissible under <u>Daubert</u> because they lack a sufficient basis in facts or data and are supported only by his *ipse dixit*.  <u>Id.</u> at 8-9.

The Court denies Plaintiffs' motion to strike Dr. Englund's testimony and disagrees with Plaintiffs' characterization of Dr. Englund's opinion.  Plaintiffs characterize Dr. Englund as opining that there was no common defect in Oasis decking.  <u>Id.</u> at 6.  Plaintiffs ask why Dr. Englund would acknowledge that "in the wood industry moisture is the culprit for 99% of defects" and yet assert that water was not the cause of the defect without a scientific explanation as to why this case falls into the other 1%.  <u>Id.</u> at 11.  However, Dr. Englund did not offer an affirmative opinion about whether Oasis suffered from a common defect, so Plaintiffs' contention that he fails to support such an opinion with the requisite factual basis is inapposite. As Dr. Englund explained in his declaration, his "opinion is that there is no way to tell, based on

the work that Plaintiffs' experts did, what about [Oasis'] manufacture or design caused some of the wood polymer composite boards to split and crack, much less to determine whether all other boards will split and crack." D. 169 ¶ 3. As Plaintiffs have advanced no basis as to why Dr. Englund is unqualified to evaluate the Exponent Report while declining to offer his own theory of the cause of the Oasis failure, Plaintiffs' motion to strike Dr. Englund's testimony fails.

**B.**     **Dr. Klyosov Expert Testimony**

Plaintiffs have also moved to exclude the expert opinion of Dr. Klyosov. D. 165. Dr. Klyosov is a scientist retained by DNA to evaluate Plaintiffs' expert reports. Dr. Klyosov opined that "[t]he performance issues observed in some Oasis decking material is not the result of a 'common defect of water absorption,' not a result of its formulation, and not a result of any other 'common' characteristic but of variable factors such as extrusion temperatures and speeds that affect material properties such as porosity and internal stress." D. 131-6 at 6-7. He also concluded that (1) Plaintiffs' experts' opinions are unreliable and unscientific; (2) Plaintiffs' experts are unqualified; and (3) individual investigation is required to evaluate whether a particular Oasis deck is defective. Id. at 7-8.

First, Plaintiffs argue that Dr. Klyosov lacks specialized knowledge to qualify as an expert on causes of decking failure. D. 166 at 9. Plaintiffs argue that Dr. Klyosov was educated as a geneticist, not an engineer, and his curriculum vitae "suggests he has very limited knowledge of polymers." Id. at 10. Dr. Klyosov has experience overseeing the manufacture of Geodeck, another composite deck product, but he testified at his deposition that Geodeck is different from Oasis because Geodeck is made from paper pulp and has a higher mineral content.

Id.  Furthermore, Plaintiffs claim that Dr. Klyosov has been retained by other attorneys, yet his testimony "has yet to be accepted by another court."  Id. at 11.

The Court concludes that Dr. Klyosov is qualified to provide an expert opinion about composite deck failure.  A court must determine, "given the proffered expert's background, whether the scientific, technical, or other specialized knowledge he offers 'will assist the trier better to understand a fact in issue.'"  Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar, 345 F.3d 15, 24 (1st Cir. 2003) (quoting United States v. Alzanki, 54 F.3d 994, 1005 (1st Cir. 1995)).  Dr. Klyosov's training is in chemistry:  he has a Ph.D. in Chemistry and an advanced degree in Physical Chemistry from Moscow University.  D. 171 at 3. He is the author of Wood-Plastic Composites, a technical treatise on wood-plastic composite materials cited by Plaintiffs' experts.  Id.  He served for ten years as chief scientist and Vice President of Research and Development for Kadant Composites, a wood-plastic composite decking manufacturer.  Id. at 4.  The Court finds unpersuasive Plaintiffs' effort to distinguish his experience on the ground that Geodeck, the product manufactured by Kadant, was made from paper pulp instead of wood flour or that all but one of his prior engagements as an expert witness involved cases that resolved before trial.  Id. at 10.

Plaintiffs next argue that Dr. Klyosov's opinion that Oasis decking does not suffer from a common defect of water absorption is not based on facts or data as required by Daubert.  The record establishes that Dr. Klyosov considered a substantial body of data in formulating his conclusions.  He studied the named Plaintiffs' decks, other warranty decks and a sample of Oasis decks in Wisconsin and Ontario that showed no signs of any defect.  D. 131-6 at 28-32.  Dr. Klyosov reviewed the batch data and raw material records of the Oasis manufacturing process

and concluded, in contrast to the Exponent Report's conclusion, that the formulation of Oasis was not consistent.  Id. at 9-13.  He also visited the Oasis manufacturing facility and reviewed the testing and data cited in the Exponent Report.  Id. at 18.

The Court also concludes that Dr. Klyosov's opinion is based on reliable methods as required by Daubert.  As summarized in Dr. Klyosov's report and treatise, water absorption is influenced by the chemical composition of the product and manufacturing variables such as extrusion speed and temperature.  Id. at 13-15.  Dr. Klyosov's research also supports his conclusion that warping and cracking are not only caused by water absorption, but also by stress characteristics influenced by manufacturing.  Id.  Dr. Klyosov next analyzed whether the formulation used to manufacture Oasis was unsound in some way that would make all Oasis defective.  Dr. Klyosov determined that the formulation of Oasis was not the cause of its failure after reviewing both the Strandex formulation and the formulation used by DNA and cross-referencing these formulations with his prior study of successful wood-plastic composite formulations.  Id. at 19-22.  Dr. Klyosov also reviewed DNA's production records and opined that there were variances in the Oasis manufacturing process that would have affected Oasis performance.  Id. at 8-13.  The fact that Dr. Klyosov performed additional testing in other projects is not dispositive of the adequacy of his investigation here, where Dr. Klyosov is not offering an opinion about a uniform property of Oasis but rather its variability.  Furthermore, Plaintiffs object that Dr. Klyosov conducted tests involving scratching Oasis boards with his finger and testing whether the board floated, but they offer no reason as to why these tests, in combination with the other methods detailed above, preclude Dr. Klyosov from reaching a

reliable conclusion.  Accordingly, the Court denies the motion to exclude Dr. Klyosov's expert opinion.

### C.      Common Defect Expert Testimony

Mastic has moved to exclude any expert opinion testimony offered by Drs. Wolf and Garcia-Leiner or any other expert that all Oasis decking suffers from a common defect.  D. 137, D. 138 at 2.  First, Mastic argues that the Exponent experts' methodology and conclusions are unreliable because they limited their review to the "warranty decks," a biased sample of decks known to have problems.  D. 138 at 2.  Second, Mastic challenges Drs. Wolf and Garcia-Leiner's failure to evaluate whether possible alternative causes rather than excessive water absorption, such as variations in the manufacturing process, could be responsible for the problems identified with Oasis decking.  Id.

These issues with the common defect opinion in the Exponent Report go to the weight of the testimony, not its admissibility.  "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  Ruiz, 161 F.3d at 85 (citing Daubert, 509 U.S. at 590).  "Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct."  Id.

Drs. Wolf and Garcia-Leiner's study of the warranty boards instead of a larger sample does not render their methodology or conclusions inadmissible.  They found, based on a review of DNA production logs, that the Oasis decking material was formulated and manufactured

uniformly with only minor deviations in composition.  D. 116 at 23-28.  Dr. Wolf testified at his deposition that he concluded that the 879 inspection reports (that had been generated from the total 1,582 warranty claims received by Defendants) were representative samples through which to study Oasis because they were distributed across a vast geographic area and covered the entire manufacturing period of Oasis.  D. 131-25 at 49.  Dr. Duane Steffey, another expert retained by Plaintiffs, opined that "[n]either random nor proportionally representative samples are required to assess reliably the strength and biological gradient of association between moisture exposure and deck damage, instead the important consideration is whether the subset of inspected decks included in the warranty claims analysis . . . spans the observed range of moisture conditions and severity of deck cracking and warping."  D. 139-2 at 7.  Dr. Wolf's study of Oasis extended beyond the warranty decks:  he also performed a literature review of technical data and studies on wood-plastic composites.  D. 116-1 at 46.  Dr. Garcia-Leiner tested the chemistry and formulation of samples of Oasis decking from the named Plaintiffs as compared to other wood polymer decking, and his consistent results in morphology, chemical composition and thermal properties supported his conclusion that Oasis was manufactured consistently.  D. 131-29 at 18. The evidence in the record that Oasis was made using a consistent formula provides enough support for Plaintiffs' experts' analysis of the warranty boards as a method to evaluate the Oasis product overall to survive the Daubert standard.

Drs. Wolf and Garcia-Leiner's failure to rule out alternative causes of the Oasis damage similarly does not warrant excluding any testimony of a common defect.  At his deposition, Dr. Garcia-Leiner testified that he could not eliminate the possibility that manufacturing issues caused the failure of the Oasis decks alleged by Plaintiffs.  D. 131-29 at 53.  Mastic cites to Dr.

Englund's conclusion that reliable testing of the Exponent Report's hypothesis of a common Oasis defect could have been "readily" accomplished.  D. 131-7 at 7.  The Exponent Report considered and discredited possible alternative explanations for the Oasis damage, including installation error and weather conditions.  As long as the expert opinion meets the requirements of Rule 702, there is no additional requirement that an expert eliminate all alternative possible causes in offering a differential diagnosis.  See Anello v. Shaw Industries, Inc., No. 95-cv-30234-FHF, 2000 WL 1609831 at *5 (D. Mass. March 31, 2000) (admitting expert opinion testimony where expert had "considered and discredited other potential environmental sources of causation and recognized that he could not rule out all other potential causes or conclude that the carpet definitively caused the plaintiffs' injuries").  While there may be other problems with some or all Oasis products (such as the manufacturing problems that Mastic suggests may have affected only a subset of Oasis decks), the Exponent Report reached an affirmative conclusion that Oasis suffers from a common defect of excessive water absorption, and this opinion is sufficiently reliable and relevant to satisfy the Daubert standard.

The fundamental disagreement between Dr. Klyosov and the Exponent Report is whether Oasis was manufactured consistently such that study of the damage to the warranty decks can reliably be applied to conclusions about a common defect of all Oasis decks.  The experts on both sides have presented factual support and detailed explanations of their methods supporting their explanations of the likely causes of the damage to Oasis decks.  "[T]he First Circuit has repeatedly held that a challenge to the 'factual underpinning' of an expert's opinion 'is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury.'" United States v. Perocier, 269 F.R.D. 103, 106 (D.P.R. 2009) (quoting United States v. Vargas,

471 F.3d 255, 264 (1st Cir. 2006)).  That is, it is anticipated that all of the parties' experts will be subject to cross examination regarding the scope and basis of their opinions at trial.  After examining the evidence and methodologies supporting these experts' reports, the Court concludes that both satisfy <u>Daubert</u> and it will fall to the jury to weigh the competing experts' theories.

### D.      Additional Daubert Motions

DNA filed three additional <u>Daubert</u> motions the day before the hearing on Plaintiffs' motion for class certification and Plaintiffs' and Mastic's <u>Daubert</u> motions.  Plaintiffs has now moved to strike DNA's <u>Daubert</u> motions.  D. 189.  The Court concludes that DNA's <u>Daubert</u> motions are timely insofar as no deadline to file <u>Daubert</u> motions has expired and declines to preclude consideration of these motions for any alleged failure to comply with Local Rule 7.1(a)(2).  The Court, therefore, denies the motion to strike and will consider DNA's <u>Daubert</u> motions after Plaintiffs have had an opportunity to respond.

## IV.   Class Certification

### A.      Legal Standard

"[D]istrict courts have broad discretion to grant or deny class certification."  <u>McCuin v. Sec'y of Health & Human Servs.</u>, 817 F.2d 161, 167 (1st Cir. 1987).  Before certifying a class, the Court must evaluate whether the named Plaintiffs seeking class certification have satisfied their burden of proving all elements of Rule 23(a) and one Rule 23(b) requirement.  <u>Smilow v. Sw. Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 38 (1st Cir. 2003).  To satisfy the requirements of Rule 23(a), a plaintiff must establish that:  (1) "the class is so numerous that joinder of all members is impracticable," (2) "there are questions of law or fact common to the class," (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and (4)

"the representative parties will fairly and adequate protect the interests of the class."  Fed. R. Civ. P. 23(a)(1)-(4); <u>Wal-Mart Stores, Inc. v. Dukes</u>, ___ U.S. ___, 131 S. Ct. 2541, 2548 (2011). A class action plaintiff must also satisfy at least one of the three requirements set forth in Rule 23(b).  Plaintiffs here rely on Rule 23(b)(3), which applies when "questions of law or fact common to class members predominate over any questions affecting only individual members" and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."

The Court "must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class."  <u>Smilow</u>, 323 F.3d at 38 (citing <u>Gen. Tel. Co. of Sw. v. Falcon</u>, 457 U.S. 147, 161 (1982)).   In doing so, a court may "probe behind the pleadings . . . to formulate some prediction as to how specific issues will play out."  <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 522 F.3d 6, 17 (1st Cir. 2008) (internal citations and quotation marks omitted).  This is because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  <u>Wal-Mart</u>, 131 S. Ct. at 2551-52 (quoting <u>Falcon</u>, 457 U.S. at 160).

Plaintiffs have moved to certify a class defined as "[a]ll individuals and entities that own homes, residences, buildings, or other structures physically located in the states of Massachusetts, Minnesota, New York, and Oregon in which Oasis Decking is or has been installed, excluding the following:  defendants in this litigation; parent or subsidiary entities of those defendants; representatives, assigns, or successors of those defendants; and the judge to whom this case is assigned and her immediate family."  D. 94 at 1.

**B.**     **<u>Standing</u>**

Article III's standing requirement creates an "outer limit" within which class certification under Rule 23 operates.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 770 (1st Cir. 2011); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints").  Defendants argue that class certification is impermissible where some class members, such as owners of buildings where Oasis has performed perfectly and where Oasis is no longer installed, have not suffered any present, concrete injury.  D. 130 at 21.

The First Circuit has recently clarified that "as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied."  In re Nexium Antitrust Litig. ("Nexium"), 777 F.3d 9, 32 (1st Cir. 2015) (quoting Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 676 (7th Cir. 2009)).  In Nexium, the First Circuit held that a putative class of purchasers of brand-name heartburn medication had standing even though not all putative class members had suffered the alleged shared injury:  overpayment for brand-name medication.  Id.  Because it was undisputed that the named plaintiffs had overpaid for the medication in question, the class had standing, and the First Circuit noted that "[t]o the extent that it is necessary that each and every member of the class who secures a recovery also has standing, the requirement will be satisfied—only injured class members will recover."  Id.  In the present case, it is undisputed that the named Plaintiffs have suffered injury through the alleged damage to their Oasis decks, so the Article III standing requirement is satisfied.

### C.    Ascertainability

Although not explicitly mentioned in Rule 23, an implicit prerequisite to class certification is that "the class must be 'definite,' that is, the standards must allow the class

members to be ascertainable." <u>Nexium</u>, 777 F.3d at 19 (citing William B. Rubenstein, Newberg on Class Actions §§ 3:1, 3:3 (5th ed. 2013)).  A class is ascertainable where it is defined by an "objective criterion." <u>Matamoros v. Starbucks Corp.</u>, 699 F.3d 129, 139 (1st Cir. 2012).  Not every class member must be identified at the outset of the case, but the class must be "unambiguously defined in order for a court to decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment." <u>Kent v. SunAmerica Life Ins. Co.</u>, 190 F.R.D. 271, 278 (D. Mass. 2000).

Plaintiffs assert that the proposed class is ascertainable because class membership "hinges on two straightforward questions:  whether an individual owns a structure with an Oasis installation, and if so, whether that structure is located in one of the four states at issue in this litigation."  D. 99 at 21.  As building a deck is a major event for property owners, they can be expected to recall whether their decks were built with Oasis or to obtain documentation from their builder or contractor.  <u>Id.</u> at 21-22.  Plaintiffs point to the fact that Oasis was sold for only a few years and all Oasis products are laser-etched with product identification.  <u>Id.</u> at 22; D. 159-6 at 9.  Defendants reply that Mastic sold decking to distributors, not to homeowners.  Other than the records of the small percentage of persons who have submitted warranty claims, Mastic has no records identifying most potential class members.  D. 123 at 19.

The Third Circuit considered ascertainability in <u>Carrera v. Bayer Corp.</u>, 727 F.3d 300, 306-07 (3d Cir. 2013).  The Third Circuit denied class certification to a proposed class of consumer purchasers of a weight loss supplement that was sold through intermediary retailers. Among other suggested ways of ascertaining class membership, the plaintiff proposed that the class could be ascertained through records of sales made through intermediary's loyalty cards

and websites.  Id. at 308.  The Third Circuit concluded that the evidence offered by plaintiff was inadequate because, while retailer records may be an acceptable way of proving class membership, there was "no evidence that a single purchaser of [the weight loss supplement] could be identified using records of customer membership cards or records of online sales" kept by the intermediary retailers.  Id. at 309.  Furthermore, there was "no evidence that retailers even have records for the relevant period."  Id.  In Byrd v. Aaron's Inc., the Third Circuit later clarified that the ascertainability inquiry is "narrow" and the rule from Carrera is that "ascertainability only requires the plaintiff to show that class members can be identified."  Byrd v. Aaron's Inc., 784 F.3d 154, 165 (3d Cir. 2015) (quoting Carrera, 727 F.3d at 308 n.2).  Cf. Mullins v. Direct Digital, LLC, 795 F.3d 654, 657 (7th Cir. 2015) (upholding ascertainability requirement in that "a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind" but declining to adopt the Third Circuit's practice of expanding the ascertainability inquiry to "examine the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit").

The Court concludes that the proposed class definition meets the implicit ascertainability requirement.  Carrera and other cases involving the difficulty of ascertaining a class of purchasers of consumable products, see, e.g., Karhu v. Vital Pharmaceuticals, Inc., 2014 WL 815253 at *1 (S.D. Fla. March 3, 2014), are inapposite here where the purchase in question is a significant and lasting addition to a property.  While individual consumers did not purchase Oasis directly from Mastic and there is no comprehensive purchase record available from Oasis distributors, Plaintiffs need not be able to identify all class members at this stage.  The proposed

class is determinable by a single objective criterion:  whether a person owns a property where Oasis is or was installed, as verifiable by laser-etching on the Oasis boards.  See D. 159-6 at 9.

**D.**     **Rule 23(a)**

*1.     Numerosity*

To bring a class action "the class [must be] so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a) (1).  The absolute number of class members is not the sole determining factor, and "[t]here is no threshold number of class members that automatically satisfies this requirement."  Shanley v. Cadle, 277 F.R.D. 63, 68 (D. Mass. 2011) (citing Gen. Tel. Co. of the Nw. v. EEOC, 446 U.S. 318, 329 (1980)).  Courts have generally found that a class size of forty or more individuals will satisfy the numerosity requirement.  In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003) (internal citation omitted).

Defendants do not appear to dispute numerosity and the Court concludes that Plaintiffs have met this requirement.  According to a DNA database, over 16 million feet of Oasis were produced.  D. 159-33 at 2.  DNA has introduced testimony that this volume is enough to make approximately 20,000 decks.  D. 159-32 at 19-20.  The record supports the conclusion that the class is large enough to make joinder of all members impracticable.

*2.     Commonality*

To proceed as a class action, there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The Supreme Court has noted that this "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common "questions."'  Wal-Mart, 131 S. Ct. at 2551 (quoting Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009)).  The Court continued:

> What matters to class certification. . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

<u>Id.</u> (quoting Nagareda at 132).  The "claims must depend upon a common contention [that] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u>

Plaintiffs offer a list of common questions that they argue are amenable to classwide resolution:  "(a) whether Oasis is intrinsically defective and unfit for use as a decking product; (b) when DNA and Mastic knew or had reason to know that Oasis was intrinsically defective and unfit for use as a decking product; (c) whether DNA deceptively substituted product with a different formulation when obtaining ICC-ES listing for Oasis; (d) whether Mastic made deceptive claims about the quality and durability of Oasis in its marketing literature; and (e) whether DNA and Mastic formed a principal-agent relationship in the course of marketing or claim processing." D. 99 at 23.  Plaintiffs argue that they have established commonality because these questions "can be answered 'yes or no for the entire class.'" <u>Id.</u> (citing <u>Donovan v. Philip Morris USA, Inc.</u>, 2012 WL 957633 at *21 (D. Mass. Mar. 21, 2012)).

In light of <u>Wal-Mart</u>, the possibility of a yes or no answer to a classwide question is inadequate to establish commonality.  Plaintiffs must show that the proposed common questions will lead to answers "apt to drive the resolution of the litigation," meaning that they "will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Wal-Mart</u>, 131 S. Ct. at 2551.  Plaintiffs are correct that the five questions offered could be answered yes or no for

the entire class.  However, further inquiry is necessary to determine whether these answers will "drive the resolution" of any of Plaintiffs' causes of action.[2]

a) <u>Express Warranty</u>

Plaintiffs assert express warranty claims against Mastic under the laws of Massachusetts, Minnesota, New York and Oregon.  These claims are governed by § 2-313 of the Uniform Commercial Code ("UCC"), which provides that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  <u>See</u> Mass. Gen. Laws ch. 106, § 2-313; Minn. Stat. § 336.2-313; N.Y. U.C.C. § 2-313; Or. Rev. Stat. § 72.3130.  Plaintiffs raise two theories of express warranty liability.  First, Plaintiffs argue that Mastic breached an express warranty arising out of the statements Mastic made in the course of marketing Oasis about the product's durability.  Second, Plaintiffs contend that Mastic breached the limited warranty it offered by suggesting that Oasis would last for ten to twenty-five years.

Plaintiffs have not offered a common question that would drive the resolution of the litigation of either of these express warranty theories.  Determining which, if any, representations by Mastic became a basis of the bargain between Mastic and an individual plaintiff would be driven by individualized proof, especially in light of the fact that Mastic used a multi-tiered distribution system and did not sell Oasis directly to homeowners.  Furthermore, even if it could

---

[2] While Plaintiffs' Second Amended Complaint includes claims of negligence against both Defendants and negligent misrepresentation against Mastic, <u>see</u> D. 53 ¶¶ 189-218, Plaintiffs appear to move for certification only on their claims of unjust enrichment, breach of implied and express warranty, and violation of state consumer protection laws.  <u>See</u> Pl. Mot., D. 99 at 30 (stating that "in their second amended complaint, Plaintiffs assert claims for unjust enrichment, breach of implied and express warranty, and violation of certain consumer protection laws" and proceeding to analyze under separate headings Plaintiffs' argument as to why the consumer protection, express warranty, implied warranty and unjust enrichment claims meet the class certification requirement).

26

be established which representations made by Mastic to the intermediaries, contractors or consumers were part of the basis of the bargain, whether the goods in fact conformed to these representations is also a question of individualized proof.

### b)   Implied Warranty

Plaintiffs assert implied warranty claims against both Defendants under Massachusetts and Minnesota law. These claims arise out of the implied warranty of merchantability under § 2-314 of the UCC, which requires that goods be "fit for the ordinary purposes for which . . . goods are used." Mass. Gen. Laws ch. 106, § 2- 314(2)(c); Minn. Stat. § 336.2-314(2)(c). To decide whether a product breaches the implied warranty of merchantability, a court must consider whether the product fails ordinary expectations for use. See BASF Corp. v. Sublime Restorations, Inc., 880 F. Supp. 2d 205, 217 (D. Mass. 2012); Daigle v. Ford Motor Co., 713 F. Supp. 2d 822, 826 (D. Minn. 2010). Here, however, some consumers received Oasis decks that are alleged to be unfit for ordinary use, whereas others have had no performance problems with their decks. In light of this record, whether a particular Oasis deck fails ordinary expectations for use is not a common question susceptible to classwide proof or determination.

### c)   Unjust Enrichment

Plaintiffs assert unjust enrichment claims under the laws of Massachusetts, Minnesota, New York and Oregon. These state laws require that a plaintiff confer a benefit on a defendant; that the defendant knew or appreciated that benefit; and that the defendant's retention of the benefit was unjust. See Blake v. Prof'l Coin Grading Serv., 898 F. Supp. 2d 365, 390 (D. Mass. 2012); Acton Constr. Co. v. State, 383 N.W.2d 416, 417 (Minn. Ct. App. 1986); Lake Minnewaska Mtn. Houses Inc. v. Rekis, 686 N.Y.S.2d 186, 187 (N.Y. App. Div. 1999); Volt

Servs. Grp. v. Adecco Emp't Servs., Inc., 35 P.3d 329, 337 (Or. Ct. App. 2001).  None of the common questions proposed by Plaintiffs could generate answers that could drive the resolution of these claims.  To resolve these claims, individual Plaintiffs would need to demonstrate that due to the condition of their decks and notwithstanding any warranty payments offered by Defendants (and accepted or rejected by Plaintiffs), the Plaintiff conveyed on Defendants a benefit that would be unjust for Defendants to retain.

d)      Consumer Protection

Plaintiffs assert claims under the consumer protection laws of Massachusetts, New York and Minnesota.  See Mass. Gen. Laws ch. 93A, § 2(a) ("[u]nfair or deceptive acts or practices are hereby declared unlawful"); N.Y. Gen. Bus. Law § 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade, or commerce . . . are hereby declared unlawful"); Minn. Stat. §§ 325D.13 ("[n]o person shall . . . knowingly misrepresent . . .  the true quality, ingredients, or origin of . . . merchandise").  These laws each require a showing of injury and causation.  See Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503, (2013); LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1488 (D. Minn. 1996); City of New York v. Smokes-Spirits.Com, Inc., 911 N.E.2d 834, 838 (N.Y. 2009).  As discussed above, questions of injury and causation are not amenable to common resolution for this proposed class, where the record raises individualized questions of proof as to whether an Oasis owner has actually suffered any injury, whether that injury has already been remedied by the Oasis warranty program and whether a particular representation or action by Defendants caused that owner's damages.

3.       *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality requires that the "class representative . . . suffer the same injury as the class members." Gen. Tel. Co. of Southwest v. Falcon, 457 U.S 147, 156 (1982) (internal citation omitted). The class representatives' claims are "typical" when their claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theory." García-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009) (internal quotation omitted). "The central inquiry in determining whether a proposed class has 'typicality' is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class." Barry v. Moran, No. 05-cv-10528-RCL, 2008 WL 7526753 at *11 (D. Mass. May. 7, 2008) (internal quotation omitted). In evaluating typicality, the Court seeks to ensure that the "named plaintiff[s], in presenting [their] case, will necessarily present the claims of the absent plaintiffs." Randle v. Spectran, 129 F.R.D. 386, 391 (D. Mass. 1988) (quoting Priest v. Zayre Corp., 118 F.R.D. 552, 555 (D. Mass. 1985)).

The named Plaintiffs argue that they are typical class representatives because they all purchased Oasis decks and "experienced rapid cracking and splitting of their Oasis decking within a few years of installation." D. 99 at 26. Plaintiffs analogize the instant case to Payne v. Goodyear Tire & Rubber Company, 216 F.R.D. 21 (D. Mass. 2003), where the court found typicality satisfied where each putative class representative had installed an allegedly defective rubber hose in his or her home radiant heating system. The Payne court rejected the argument that the named plaintiffs were not typical of class members who used the rubber hose in question

for applications other than home heating (such as snow melting), finding the distinction speculative at the class certification stage.  Id. at 26.

The Court concludes that given the breadth of the proposed class definition the named Plaintiffs have not met the typicality requirement for several reasons.  First, the named Plaintiffs allege that they suffered failure of their Oasis decks, whereas most class members have not reported any problems with their Oasis decks, so the alleged injury suffered is not common.  Plaintiffs argue that this is a case where all class members have been injured by an inherent defect in the composition of Oasis, and whether some class members' decks have not yet manifested defects is irrelevant.  D. 99 at 24.  If some decks have deteriorated more than others, Plaintiffs argue, this goes to damages rather than typicality.[3]  However, the "majority view is that there is no legally cognizable injury in a product defect case, regardless of whether the claim is for fraud, violation of consumer protection statutes, breach of warranty, or any other theory, unless the alleged defect has manifested itself in the product used by the claimant."   1 MCLAUGHLIN ON CLASS ACTIONS § 5:56 (11th ed.).  Even if the putative class members with Oasis decks in perfect condition were considered to be injured due to a latent compositional defect in their Oasis, this group of would not share the same kind of injury or theory of damages as the named Plaintiffs.

Plaintiffs cite Daffin v. Ford Motor Co., 458 F.3d 549 (6th Cir. 2006), for the proposition that all class members' products need not manifest defects for a finding of common injury sufficient to support typicality.  Daffin involved sticking accelerator pedals in automobiles

---

[3] Plaintiffs also cite Wolin v. Jaguar Land Rover North America, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) for the proposition that if some decks deteriorated more than others, this goes to damages and not typicality.  However, the Ninth Circuit adopts the minority position that proof of the manifestation of a defect is not a prerequisite to class certification.  Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975).

caused by a component with an alleged design defect.  Id. at 552–553.  The plaintiffs in Daffin sought recovery for the diminution in value to their cars caused by the defective component.  The district court concluded that "Daffin's claim is . . . typical of owners who have experienced sticking accelerators and owners who have not experienced sticking accelerators only so long as Ohio law allows recovery for purely economic loss resulting from a defective Villager being worth less than a defect-free Villager."  Daffin v. Ford Motor Co., No. C-1-00-458, 2004 WL 5705647 at *2 (S.D. Ohio July 15, 2004).  The court proceeded to analyze whether a claim of defect without manifestation of symptoms would be actionable under Ohio law.

This case is inapposite here, as Plaintiffs do not rely on a diminution of value theory of damages.  Plaintiffs have presented a replacement cost theory of damages that Plaintiffs' damages expert opined would require individual inspection of each deck to determine which components require replacement.  D. 124-8 at 3-4.  It follows that the owners of decks that do not require replacement because they have performed in a manner consistent with any warranties offered by Defendants have not suffered a common injury with those owners who have damaged decks.  Plaintiffs also have not met their burden of showing that a latent defect is actionable under the various state laws asserted here.

Next, the named Plaintiffs are also atypical of the class because the four named Plaintiffs either did not accept the warranty payments offered to them by Defendants or were deemed ineligible for warranty compensation due to installation error, whereas most class members who submitted claims for damage to their Oasis decks accepted warranty payments, some of which payments included costs beyond those covered by the warranty program such as labor costs.  Putative class members who accepted the warranty payment offered by Defendants have

received redress for their injury and now do not suffer the same injury that the named Plaintiffs seek to remedy in this litigation.

Finally, the breadth of the proposed class definition presents additional problems.  The class includes purchasers of Oasis and transferee owners who purchased a building that already had Oasis installed.  The named Plaintiffs are all direct purchasers of Oasis decks and their theory of Defendants' liability will differ from the claims of a transferee owner who did not view any representations by Mastic about Oasis and did not select or pay for Oasis.  Depending on the date of the Oasis purchase, transferee owners may not be eligible for warranty coverage.  Plaintiffs have not established that they are typical of absent class members—for instance, those whose decks are not presenting any signs of damage or those who accepted warranty payments.[4]

4.    *Adequacy*

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); see Falcon, 457 U.S. at 156.  To meet the adequacy requirement, Plaintiffs must show that:  (1) "the interests of the representative party will not conflict with the interests of the class members"; and (2) "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation."  In re Boston Scientific, 604 F. Supp. 2d at 282 (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)).  The Court accepts as adequate the qualification and experience of Plaintiffs' counsel.  See D. 96 at 12-15.  However, for the reasons discussed above under the rubric of typicality, the Court finds that conflicts between the class members and the

---

[4] Given the Court's ruling regarding typicality on the grounds discussed above, the Court need not reach DNA's argument that Pagliaroni and O'Brien are subject to a statute of limitations defense on their implied warranty claims that makes them atypical of the rest of the class. D. 130 at 24-25.

representative parties render the named Plaintiffs inadequate representatives of the interests of the class.

### E.    Rule 23(b)

In light of the Court's finding that Plaintiffs have failed to satisfy the requirements of Rule 23(a), the Court need not address the requirements of Rule 23(b)(3).   See Rodriguez-Feliciano v. P.R. Elec. Power Auth., 240 F.R.D. 36, 39 (D.P.R. 2007) (declining to address whether plaintiffs satisfied Rule 23(b) requirements where plaintiffs failed to show commonality, typicality and adequacy under Rule 23(a)).

## V.    Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification is **DENIED**, D. 94. Mastic's motion to exclude Plaintiffs' expert testimony that Oasis suffers from a common defect is **DENIED**, D. 137.   Plaintiffs' motion to exclude the testimony of Dr. Englund and Dr. Klyosov is **DENIED**, D. 160, D. 165.   Plaintiffs' motions to strike DNA's motions to exclude the expert testimony of Albert L. DeBonis, Manuel Garcia-Leiner and Joel Wolf are **DENIED**, D. 189.

So Ordered.

/s/ Denise J. Casper
United States District Judge